



The Court has reviewed the parties' submissions and has determined that setting a briefing schedule for Defendants' anticipated motion to dismiss is appropriate at this juncture.  Defendants shall file their motion by January 19, 2024, Plaintiff shall file opposition by February 5, 2024, and Defendants shall file any reply by February 12, 2024.  The Clerk of Court is respectfully directed to close Docket Number 17.

January 5, 2024

SO ORDERED.
Date: January 8, 2024
New York, New York

JOHN P. CRONAN
United States District Judge

**BY ECF**

Hon. John P. Cronan
United States District Judge
Southern District of New York
500 Pearl St.
New York, NY 10007-1312

  Re: *Srour v. New York City*, 23 Civ. 9489 (JPC)

Dear Judge Cronan,

  I represent the plaintiff, Joseph Srour, in the above-referenced matter. Please accept the following in response to the Court's December 12, 2023 Order directing the parties to file letter-briefs advising the Court as to their view of the impact that the Second Circuit's decision in *Antonyuk v. Chiumento*, No. 22-2908 (2d Cir. Dec. 8, 2023) has on this case. The *Antonyuk* decision touched on numerous issues, from standing to certain provisions of the Concealed Carry Improvement Act (CCIA) related to licensing and prohibited locations. Discussed below are the relevance of (i) standing and (ii) "moral character" assessments in applications for concealed carry licenses.

***Antonyuk*** **Establishes Standing For Joseph Srour**

  The sole plaintiff in *Antonyuk* with standing to challenge certain disclosure requirements of the CCIA – plaintiff Sloane - had neither applied for a concealed carry license, nor had an application denied. Sloane raised constitutional objections to being subjected to specific licensing provisions.

> Sloane's challenge is of a different type. Rather than challenge eligibility criteria [like the good moral character requirement], Sloane argues that a portion of the application process is unconstitutional. His injury flows from the application itself, not from his asserted ineligibility for a license.

*Antonyuk*, 2023 WL 8518003, at *20 (2d Cir. Dec. 8, 2023).

  Leaving aside the "moral character" factor (discussed further below), Mr. Srour objects to specific requirements of the licensing process[1] including the License Division's enforcement of subsections (a), (e), (h), and (n) of 38 RCNY 3-03 and 38 RCNY 5-10 in considering Mr. Srour's

---

[1] "By eliding the distinction between challenges to eligibility rules and to the application process, the State in effect argues that the only way a plaintiff can challenge an application process is to do exactly what the plaintiff claims that he may not be required to do. Such a rule contravenes common sense. An applicant who challenges an application itself is not required to first comply with the objected-to component before bringing suit. Therefore, Sloane may challenge the disclosure requirements without first making the required disclosures." *Antonyuk*, at *21.

pending applications for a license to possess handguns in his home, to possess rifles and shotguns, and to carry a handgun concealed. Mr. Srour has standing to challenge the enforcement of the subsections in the consideration of his applications. He does not lose standing because he chose to subject himself to the licensing process rather than not applying, like Sloane.

### *Antonyuk* Did Not Sanction Any Particular Grounds For "Moral Character" Assessments

Even if, as the *Antonyuk* panel held, it is proper for a government worker to assess everyone's moral character to decide if they may exercise a preexisting right, *Antonyuk* offered no sanctuary to any particular 'grounds' by which such determination is reached. To the contrary, *Antonyuk* confirmed the impropriety of using good moral character as a "smokescreen to deny licenses" for reasons untethered to dangerousness, which "would violate the Constitution by relying on a ground for disarmament for which there is no historical basis." *Antonyuk*, at *24–25. Mr. Srour is a law-abiding individual who has no disqualifiers to the possession of firearms under state or federal law. Subsections (a), (e), (h), and (n) of 38 RCNY 3-03 and 38 RCNY 5-10 were previously enforced against him to terminate his Second Amendment rights. Mr. Srour has standing to challenge their enforcement in his present applications, as he argued in his preliminary injunction motion – he does not have to wait for a denial. Moreover, the Subsections[2] have no historical analogue or national tradition in the Founding Era as grounds for terminating Second Amendment rights – the City cannot meet its burden under the *Bruen* test.

### *Antonyuk*'s "Moral Character" Discussion Is Limited to Concealed Carry Handgun Licenses

The Second Circuit confined its decision in *Antonyuk* to <u>concealed carry handgun licenses</u>. See, *Antonyuk*, at *16 (because the plaintiffs "discuss the character requirement only with respect to concealed carry licenses, and since the sole Plaintiff claiming he is injured by the licensing regime asserts a desire to obtain only a concealed carry license, we confine our discussion to that context."). As such, *Antonyuk*'s moral character analysis and holding does not apply to long guns[3], for which there is no national tradition of government licensing or permission.

### Federal District Courts Are Bound To Adhere to United States Supreme Court Precedent

*Antonyuk*'s analysis of the moral character requirement of Penal Law § 400.00(1)(b) and government discretion in licensing is a repackaging of the means-end scrutiny thrice-rejected by the Supreme Court - advancing the same public safety agenda unambiguously rejected in *Heller, McDonald*, and *Bruen*.[4,5] *Antonyuk* ignores bedrock analysis, including the *Bruen* discussion from 2135 through 2138 and the Court's caution that "to the extent later history contradicts what the text says, the text controls [because] liquidating indeterminacies in written laws is far removed from expanding or altering them…post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137 (cleaned up). Handgun licensing did not exist until 1900 and the practice itself contradicts the plain text. "It is settled

---

[2] Subsection (a) [past arrests], (e) [consideration of dismissed charges/sealed arrests]; (h) [driving history], and (n) [catch-all provision including "unwillingness to abide by the law"].

[3] In that vein, *Antonyuk*'s moral character discussion also does not apply to mere possession of handguns (New York City handgun premises licenses).

[4] "Such dangerousness is the core of New York's character requirement, as clarified in the CCIA. The gravamen of the 'character' inquiry is whether the applicant can be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." *Antonyuk*, at *24 (2d Cir. Dec. 8, 2023) (quotation marks omitted).

[5] During oral argument before the Supreme Court in *U.S. v. Rahimi* (No. 22-915) the government conceded that 'dangerousness' determinations for purposes of terminating firearm rights should not be made at the administrative or executive level. https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/22-915_986b.pdf at p. 34 ("GENERAL PRELOGAR: I think it would be far more difficult to defend an executive branch or an administrative determination because of a separate Second Amendment principle that guards against granting executive officials too much discretion to decide who and who cannot have firearms. In the -- there was some history about that in -- in England, of course, but in the American legal tradition, these principles have been deployed through legislative judgments or through express judicial findings of dangerousness. So I don't think that we could point to the same history and tradition of giving executive branch officials that discretion.").

by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969). Permission contradicts the mandate that the right "shall not be infringed" and case-by-case pre-assessment of whether one is worthy of constitutional protections according to the opinion of a government worker – is repugnant to the Second Amendment. "The Second Amendment guaranteed 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, at 2156 (cleaned up). *Bruen* identified regulations passed by *legislatures* – bright line, objective regulations that apply across the board to all "the People."

*Antonyuk*'s moral character analysis is built on a false premise. *Antonyuk* ignored *Bruen*'s rejection of discretion in licensing schemes like "New York's outlier may-issue regime [which] is constitutionally problematic because it grants open-ended discretion to licensing officials" and rejection of "the unchanneled discretion for licensing officials." *Bruen*, at 2161. *Antonyuk* sanctioned *objective requirements* like those in the 43 shall-issue states – but held that even those requirements are subject to constitutional scrutiny. *Bruen*, at 2161-62. *Bruen* approved the objective factors of the 43 shall-issue regimes and rejected the subjective factors and may-issue aspects of 6 "outlier" states, including New York. *Bruen* did not analyze each aspect of the shall-issue regimes; it applauded regimes that "do not grant open-ended discretion to licensing officials." [*Bruen*, at 2162]. *Bruen* did not "approve" subjective assessments of applicants' moral character or "dangerousness assessments" by licensing officials.  See, *Antonyuk*, at *23. The very idea runs afoul of the Second Amendment and constitutional jurisprudence. Bright line disqualifiers based on "dangerousness" are created by Congress and state legislatures, not individualized assessments. They are also thereafter subject to challenge under the *Bruen* test.[6]

The Supreme Court consistently rejects discretion and public safety justifications in Second Amendment challenges. The "right to keep and bear arms…is not the only constitutional right that has controversial public safety implications." *Bruen*, at 2126 (quoting *McDonald v. Chicago*, 561 U.S. 742, 783 (2010) (plurality opinion). Individualized moral character 'dangerousness' assessments are a backdoor means of returning to the "important governmental interest" of "public safety." But "*Heller* expressly rejected that dissent's "interest-balancing inquiry." *Id.* This Court's analysis and reasoning in *Srour v. New York City, New York*, No. 22 CIV. 3 (JPC), 2023 WL 7005172 (S.D.N.Y. Oct. 24, 2023) is consistent with *Heller, McDonald*, *Caetano,* and *Bruen*, the plain text of the Second Amendment, and national historical tradition. This Court is bound to adhere to Supreme Court jurisprudence and the Constitution.

Very truly yours,

*Amy L. Bellantoni*
Amy L. Bellantoni

---

[6] *Antonyuk* also skewed the definition of a "facial challenge" in its moral character discussion. *Id.* at *24-25. There is, in fact, no set of circumstances under which a discretionary "moral character" assessment would be constitutional under the *Bruen* test – because there is no national historical tradition of government permission or discretion to decide on a case-by-case basis who is entitled to Second Amendment protections. By finding otherwise, the court first allowed a discretionary analysis to occur in order to justify circumstances where objective statutory disqualifiers would apply.